RIGGINS *et al.*, Plaintiffs in Error, v. MCCLELLAN *et al.*, Defendants in Error.

1. In the year 1842, a testatrix, domiciled in the state of Kentucky, died there. By her will she made the following bequest: "I give and bequeath to my daughter, Margaret Dean, a negro girl named Hannah, for to be at her disposal during her natural life, then to go to the benefit of her heirs." *Held,* that the daughter took an estate for life only, with remainder to her heirs, who would take under the will by purchase.
2. The rule in Shelly's case was not in force as law in the state of Kentucky in 1842 at the death of the testatrix.

*Error to Pettus Circuit Court.*

*Adams*, for plaintiffs in error.

I. The will vested the title to the slave Hannah absolutely in Margaret Dean. The word "heirs" in the fourth clause of the will is a word of limitation and not of purchase. That clause comes directly within the rule in Shelly's case. (2

Jarm. on Wills, 178 ; 4 Kent, 214 ; 4 Bibb, 390 ; 4 Monr. 199 ; 10 B. Monr. 60 ; 4 Har. & Jo. 431 ; Doe v. Colyer, 11 East, 548 ; Doe v. Jesson, 2 Bligh, 2 ; Doe v. Harvey, 4 Barn. & Cress. 610 ; Dott v. Cunnigton, 1 Bays, 453 ; Carr v. Porter, 1 McCord, 60 ; Polk v. Faris, 9 Yerger, 209 ; Ray v. Garnett, 2. Wash. 9 ; Lisle v. Diggs, 6 Har. & Johns. 364 ; 1 Dall. 139 ; 7 Watts & Serg. 295 ; Bishop v. Sellick, 1 Days, 299 ; Hubert v. Hulbert, 21 Mo. 277.) As the domicil of the testatrix was in Kentucky at the time of her death, which occurred in 1842, the laws of that state would govern this case. (Story's Conflict of Laws, § 390, 403—410 ; Spradling & Keeton v. Pipkin, 15 Mo. 118.)

II. In any view of the case the judgment must be for the appellants, for, even if the rule in Shelly's case did not apply, by the terms of the gift, the power to dispose of the fee was vested in Margaret Dean ; and the deed of gift to the appellants was an execution of the power which passed the absolute estate in the slaves to them. The bequest was to Margaret Dean of the slave " Hannah *for to be at her disposal* during her natural life, then to go to the benefit of her heirs." Here was a complete power of disposition vested in Margaret Dean, and the supposed remainder was dependent upon the failure to exercise the power ; but as the power was executed by the deed of gift to the appellants, the fee in the slave passed to them and the remainder could not take effect. (See Moore v. Webb, 2 B. Monr. 222 ; 3 Littell, 415 ; 4 Kent, Comm. 319 ; Ruby v. Barnett, 13 Mo. 5 ; Jackson v. Robins, 16 Johns. 587 ; 1 P. Wms. 149 ; Reed v. Shingold, 10 Ves. 370 ; Goodtitle v. Oterny, 2 Wills. ——.)

*Ryland & Son, Muir & Draffin*, for defendants in error.

I. By the law of Kentucky a person may give or bequeath slaves to one person for life and the remainder to such person's heirs, and such remainder is lawful and effectual. In a devise of personal estate, the expression " dying without issue" means, *ex vi termini*, issue living at the death

of the first taker. (4 Monr. 199; Moore's Trustees v. Howe, 4 Bibb, 390; 5 Dana, 427; 3 J. J. Marsh. 90; id. 889; 1 Marsh. 532; 3 Bibb, 39; 5 J. J. Marsh. 355; 3 Ben. Monr. 56, 106; 7 B. Monr. 14; 12 B. Monr. 653; 3 Jarm. on Wills, 10; 4 Dana, 551; 1 Burrow, 162; 1 Bailey, S. C., 100; 4 Kent, 128; Tucker's Comm. 90, 144; 1 Denio, 165; 8 Sim. 166; 7 Monr. 307; 3 Monr. 537; 9 Dana, 348; 6 J. J. Marsh. 595; 5 Dana, 427; Willes Rep. 332; 2 Blackstone's Comm. 379; Fearne on Cont. Remainders, 467; 10 Johns. 12; Cruise's Digest, tit. 32, chap. 26, § 25, 26, 27; Cowper, 234; 2 Call, 313; 6 Pet. 72.)

RICHARDSON, Judge, delivered the opinion of the court.

The controversy in this cause turns on the construction of the fourth clause of the will of Mrs. Elizabeth McCutchen, which is as follows: " I give and bequeath to my daughter Margaret Dean, a negro girl named Hannah for to be at her disposal during her natural life, then to go to the benefit of her heirs." The testatrix died in the state of Kentucky in 1842, where she had her domicil, and where her will was executed and duly probated.

The defendants insist that the word " heirs" in the fourth clause of the will is a word of limitation and not a word of purchase, and that by the rule in Shelly's case the limitation over was void, and the absolute property in the slave vested in the first taker. Both of the parties concede that as the will only disposes of personal property, it must be interpreted according to the law of the domicil of the testatrix, and we must therefore look to the law of Kentucky for ascertaining the principles which must govern the case.

The rule in Shelly's case " that wherever the ancestor takes an estate for life and in the same conveyance a remainder is limited to *his heirs* or *the heirs of his body*, he will be vested with the fee and his heirs will take by descent and not by purchase," has become firmly established in England as a rule of property; and though the policy and reason of

it have long since ceased, it has resisted every assault, and the strict and technical sense of words is allowed to overrule the manifest and avowed intention of the parties to an instrument. If the word " children" or " issue living at the death of Mrs. Dean," had been used, the limitation would have been valid; but it is said that the word " heirs" is a word of limitation which was intended to mark the nature, extent and continuance of the estate, and as it denotes the whole line of the testatrix's heirs in succession, and not particular designated persons, it must operate to expand a life estate in Mrs. Dean into an absolute estate.

But if the rule in Shelly's case was ever recognized in Kentucky, it was made subservient to the intention of the parties, and its application was subordinate to the sense in which the word " heirs" or " heirs of the body" was used. The court of appeals, in Moore v. Moore, 12 B. Monr. 656, observed, " that expositions are to be made according to common intendment is agreed by all. To whatever instrument we may be giving a construction, the words which have been employed by their author should be taken in the sense in which he understood them; and, in cases in which technical rules have been applied to particular expressions by the courts, if we are satisfied, after an examination of the instrument, these technical rules will not carry out but defeat the intention of the author, the technical rules must yield to the intention, and such a construction must be given as will effectuate it." In Prescott v. Prescott's heirs, 10 B. Monr. 58, it was admitted that the words " heirs of the body" standing alone were appropriate words of limitation; but it was said that it was " well settled by numerous decisions that not only ' heirs of the body' but the more general word, 'heirs,' or the more specific terms, ' heirs male, or heirs female of the body or of two bodies,' may be used and operate as words of purchase." And in a subsequent case, in the same volume, the words " heirs of the body" were construed to mean children; (Jarvis v. Quigby, 10 B. Monr. 106;) and a remainder created by these words held good.

Not a case has been found in the Kentucky Reports which was decided on the authority of the rule in Shelly's case. In some of the cases the rule is recognized, but so modified that its force is impaired if not destroyed, and a growing feeling of dissatisfaction is manifested against permitting an arbitrary and technical rule to override the intention of the parties; and whatever doubts may have existed previously as to whether the rule ever had any application in that state, are removed by the case of Turman v. White's heirs, 14 B. Monr. 560, in which the rule is repudiated and its application denied. In that case the grantor David White, by a deed executed in 1803, in consideration of love and affection for Solomon White, and for the further consideration of one dollar, " gives and grants to the said Solomon White during life, and then to his heirs or executors," a tract of land described by its boundaries, " to have and to hold the said tract or parcel of land unto the said Solomon White, his heirs and executors, against the claim of said David White, his executors and administrators, unto the said Solomon during life, then to his heirs forever." The plaintiffs contended that Soloman White only took a life estate, and they sought to recover by force of the deed as purchasers under the designation of *heirs*. The defendant attempted to defend under a deed executed by Solomon White, purporting to convey the whole estate, and the turning point in the case was, whether Solomon White took by the deed a life estate only, or whether the term " to his heirs" was a word of limitation and not of purchase, and operated to enlarge a life estate into a fee simple. There could not be a clearer case for the application of the rule. In other cases the court had seized upon casual expressions in instruments for the purpose of ascertaining the actual intention of the parties and repelling the application of the rule, but in the case of White's heirs there was nothing in the deed to indicate the purpose of the grantor beyond the words which are quoted, and the court was brought directly to the point, and was compelled to decide whether the word " heirs," standing alone, could be

construed, in violation of the rule in Shelly's case, to be a word of purchase, and to mean children or descendants living when the life estate expired.    It was held that upon the face of the deed it was clear that the grantor intended to give to Solomon White an estate for life only, and at his death to give the land to his heirs ; and that as Solomon White only acquired a life estate, he could not convey a greater interest, and the grant to the heirs took effect at his death in favor of those who were his heirs.    The rule in Shelly's case was pressed on the court as decisive of the cause, but it was denied to have any practical application in Kentucky ; and Judge Marshall, delivering the opinion of the court, observed, " as there is no reported case in which this court has applied the rule with the effect of determining by it the rights of property involved, it can not be said to have become a rule of property here, and especially as we believe it has not been so considered and acted on in the community.    A single manuscript decision of recent date—Humphreys v. Ayres, January, 1852, and withheld from publication as if of doubtful authority—presents the only instance referred to in which the rule has been directly applied and carried out; and in the few cases in which its existence as a common law rule has been spoken of, the court, without any direct recognition of its authority as a binding rule here, but sometimes intimating the contrary, has evaded its application by seizing upon circumstances deemed sufficient to show that the case did not come within the rule."

. The revised statutes of Kentucky, of 1852, give effect both to the limitation for life and to the subsequent limitation to the heirs, and the learned Judge further remarks, in White's case, that " we may presume that if this court had at any time before the enactment of the revised statutes decided that in case of a grant to one for life, and at his death to his heirs, the whole estate vested in the ancestor and that his alienation had passed it from his heirs, a statute similar to that just referred to would at once have been enacted."

The question arose again in 1857, in the case of William-

Riggins v. McClellan.

son v. Williamson, 18 B. Monr. 329, on the following clause in the will of Gen. James Taylor, who died before the revised statutes were enacted : " The tracts or lots which I give to my daughters, they are to have, hold and enjoy the rents and profits of the same for their separate use during their natural lives, and at their deaths the title of the same *to vest in their heirs forever*." It was decided that the rule was not in force and had no application in Kentucky, and that the testator's grand-children took under the will as purchasers.

We have examined all the Kentucky cases—which are very numerous—that relate to the subject, and we have decided this case on principles drawn from the decisions in that state. We have traced the current from its fountain and have found no difficulty in following it, for it has grown broader and deeper as it flowed, until it has swept away the last vestige of a rule which was only respectable for its antiquity. At first it was admitted that the rule existed ; it was next qualified ; it was afterwards doubted, and finally overthrown.

We think that the testatrix in this case intended only to give the slave to her daughter for the term of her life ; for the expression " during her natural life" clearly imports during her life only, and the adverb " then" shows not only the period at which Mrs. Dean's interest was to cease, but the time at which the slave was " to go to the benefit of her heirs." As Mrs. Dean only took an interest for life, she could not defeat the remainder by selling the slave, and the expression " for to be at her disposal during her natural life" did not authorize her to dispose of any greater interest than she had, and was intended, we think, by an unskillful draftsman, only to confer the largest liberty in the use of the slave during her life and to the extent of her interest. She had only a life estate, and with that interest she could do as she pleased ; but her interest ceased at her death, and then the remainder passed to her children or their descendants, who were equally with herself the objects of the testatrix's bounty. (Broach v. Kitchen, 23 Geo. 515.)

It may be observed that the rule in Shelly's case was abro-

3—VOL. XXVIII.

gated in this state, in respect of limitations by will, by the eighteenth section of the statute of wills of 1825, and, in regard to conveyances, by the seventh section of the act of 1845 concerning conveyances

Judge Scott concurring, the judgment will be affirmed. Judge Napton absent.